UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FT MYERS TAV APTS, LLC,
a Delaware limited liability company, and
THE MARCUS ORGANIZATION, INC.,
a New York corporation,

     Plaintiffs,

v.                                   Case No.: 2:25-CV-1172

EVEREST NATIONAL INSURANCE
COMPANY, a foreign corporation;
WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, a foreign
corporation; RSG SPECIALTY, LLC,
a foreign corporation; RT SPECIALTY,
a foreign corporation; and RYAN
SPECIALTY UNDERWRITING
MANAGERS, a foreign corporation,

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiffs, FT MYERS TAV APTS, LLC and THE MARCUS

ORGANIZATION, INC. (collectively, "Plaintiffs" or the "Named Insured"), by and

through the undersigned counsel submit this Complaint against Defendants,

EVEREST NATIONAL INSURANCE COMPANY ("Everest") and

WESTCHESTER SURPLUS LINES INSURANCE COMPANY ("Westchester" or

1

"Chubb") (collectively, "Insurers"), and RSG Specialty, LLC; RT Specialty; and Ryan Specialty Underwriting Managers, and in support thereof, alleges and avers as follows:

## INTRODUCTION

This is an action by the Named Insured against the Insurers and the Producers of an Insurance Policy that was procured for a ground-up construction project for luxury residential apartments in Fort Myers, Florida (the "Insured Project") which was undergoing construction when Hurricane Ian made landfall on September 28, 2022. The Insured Project, which had more than fifteen months of construction progress, was directly damaged by winds and flooding during Hurricane Ian, which caused a delay in completion and increasing project costs due to replacement, restoration, and mitigation efforts undertaken by the Insured. Despite clear policy language, extensive documentation, sworn proofs of loss, and Defendants' own consultants confirming that multiple policy sub-limits were fully exhausted, Everest and Westchester failed to pay no less than $2,525,000 in undisputed sub-limit benefits, and further failed to timely and fully adjust and pay other covered losses. The acts and omissions of the Defendants which relate to the procurement of the policy; the production of the policy; the issuance of the policy; along with the failures of

performance under the policy and the breaches of duties owed to the Insured, as set forth in detail below, are the basis for the claims asserted herein.

## I. NATURE OF THE ACTION

1.    This is an action for breach of contract, declaratory relief, statutory bad faith, unfair insurance practices, deceptive and unfair trade practices, negligent misrepresentation, negligent procurement, negligent underwriting, unjust enrichment (pled in the alternative), and violations of federal and Florida racketeering statutes arising out of Defendants' issuance, placement, underwriting, and administration of a builders-risk insurance program for a multi-family apartment project in Fort Myers, Florida.

2.    Plaintiffs seek recovery of (a) unpaid policy benefits, including but not limited to claim preparation costs, soft costs, delayed opening losses, and property damage; (b) consequential damages; (c) statutory bad-faith damages; (d) treble damages under federal and Florida RICO; (e) attorneys' fees and costs where authorized by statute or contract; and (f) such other relief as the Court deems just and proper.

## II. PARTIES

3.    Plaintiff FT MYERS TAV APTS, LLC ("Taverna") is a Delaware limited liability company.

3

4.    At all material times, Taverna was a Named Insured under the policy described below and owned or controlled the real property and improvements located at 3246 Champion Ring Road, Fort Myers, Florida 33901 (the "Insured Project").

5.    Plaintiff THE MARCUS ORGANIZATION, INC. ("Marcus") is a New York corporation, and at all material times was a Named Insured in connection with the Insured Project and an insured party entitled to benefits under the policies at issue.

6.    Defendant EVEREST NATIONAL INSURANCE COMPANY ("Everest") is a foreign insurance company, organized and existing under the laws of a state other than Florida, with its principal place of business outside Florida.

7.    At all material times, Everest issued commercial inland marine and builders risk coverage in the State of Florida and did issue such coverage to Plaintiffs.

8.    Defendant WESTCHESTER SURPLUS LINES INSURANCE COMPANY ("Westchester" or "Chubb") is a foreign surplus lines insurer, organized and existing under the laws of a state other than Florida, with its principal place of business outside Florida.

9.    At all material times, Westchester issued a quota-share "follow form" policy providing a percentage share of the builders risk coverage issued by Everest for the Insured Project.

10.     Everest and Westchester are named not as insurance producers, but as insurers that issued and participated in the insurance program at issue, and are liable for breach of contract, declaratory relief, and the acts and omissions of their authorized agents and underwriting managers acting within the scope of their authority.

11.     Defendant RSG SPECIALTY, LLC ("RSG") is a foreign limited liability company that acted as producer on the policy and is part of the Ryan Specialty enterprise.

12.     Defendant RT SPECIALTY is a wholesale insurance brokerage that marketed, structured, and placed the builders-risk program for Plaintiffs.

13.     Defendant RYAN SPECIALTY UNDERWRITING MANAGERS ("RSUM") is a managing general underwriter exercising delegated underwriting authority in connection with the policy and program at issue.

14.     RSG is the parent company for RT Specialty and RSUM.

15.     RSG, RT Specialty, and RSUM are all foreign companies, organized and existing under the laws of a state other than Florida, with its principal place of business outside Florida.

16.     At all relevant times, Defendants acted by and through their officers, employees, agents, adjusters, third-party administrators, consultants, and/or representatives, including but not limited to claim professionals and forensic accountants retained to handle Plaintiffs' claims.

### III. JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum or value of $75,000.00 (Seventy-Five Thousand Dollars), exclusive of costs, interest, and attorneys' fees, and is between citizens of different states.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b) because the insurance policy that is the subject of this action was issued or delivered in this judicial district; because the Insured Project that is the subject of the insurance policy and claims is located within this District; or because a substantial part of the events or omissions giving rise to the claims occurred in this District

19.    This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under federal law, including claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d).

20.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

21.    Personal jurisdiction over Defendants is proper because, among other things, they issued insurance coverage for a construction project located in Florida,

conducted business in Florida, and purposefully availed themselves of the privilege of conducting business in Florida.

22.    All conditions precedent to the filing of this lawsuit have occurred, have been waived or have been performed.

## IV. FACTUAL ALLEGATIONS

### A. The Insured Project and the Everest Builders Risk Policy Produced by RSG

23.    The Insured Project consists of the ground-up construction of a multi-family residential apartment complex located at 3246 Champion Ring Road, Fort Myers, Florida 33901.

24.    The Insured Project specifies construction of approximately 264,000 square feet in Fort Myers, Florida, with a total project value of approximately $34,200,000.00.

25.    In connection with the Insured Project, Defendants procured and issued a surplus-lines builders-risk policy commonly referred to as the Everest Project Builders Risk Policy. (the "Everest Policy"). *See* Exhibit A.

26.    The Everest Policy was in effect from May 12, 2021, through January 12, 2023.

27.    The Policy purports to provide coverage on an "all risks of direct physical loss or direct physical damage" basis during construction, subject to extensive limitations, exclusions, sub-limits, deductibles, and conditions.

28.    Contrary to the reasonable expectations of a Florida developer constructing a coastal project in a hurricane-dominant region, the Policy materially restricted coverage for the very perils most likely to occur, including wind-driven rain, flood, interior water damage, mold, debris removal, and delay-related losses.

29.    The Everest Policy's General Schedule identifies the Insured Project as "GROUND UP CONSTRUCTION OF A MULTI-FAMILY RESIDENTIAL APARTMENTS" with a total project value of approximately $34,200,000.00 and a policy limit of $34,200,000.00 per occurrence, subject to sub-limits and terms set forth in the policy.

30.    Among other coverage grants, the Everest Policy provides:

a.    Property Damage, insuring "all risks of direct physical loss or direct physical damage" to Insured Property at the construction site, in offsite storage, or in transit, subject to stated exclusions and conditions.

b.    Soft Costs and Delayed Opening, insuring specified "Soft Costs" and "Delayed Opening" losses resulting from a covered physical loss to Insured Property.

31.    The General Schedule and Soft Costs and Delayed Opening Schedule of the Everest Policy set forth the following key limits and sub-limits of liability, among others:

a.    Policy Limit of Liability: $34,200,000.00 per occurrence;

b.        Property Damage Limit: $31,700,000.00 per occurrence;

c.        Soft Costs Limit: $1,000,000.00 per occurrence and in the term aggregate;

d.        Delayed Opening Limit: $1,500,000.00 per occurrence and in the term aggregate;

e.        Claim Preparation Costs: $25,000.00 per occurrence.

32.    The Everest Policy provides general policy-level sub-limits for certain coverages, as part of and not in addition to the Policy Limit of Liability.

33.    Plaintiffs paid premiums in exchange for the coverage provided by the Everest Policy and complied with all obligations required to place and maintain the coverage in force.

34.    The Everest Policy was a specialty insurance product, produced by Ryan Specialty Group, LLC ("RSG").

35.    This type of insurance product requires professional judgment and disclosure.

36.    RSG is an international specialty insurance organization which includes a wholesale brokerage firm ("RT Specialty") and highly-specialized managing general underwriting companies Ryan Specialty Underwriting Managers ("RSUM") designed specifically for agents, brokers and insurers.

37.    RSG (as evidenced through the Policy at issue) acted as a producer for the Policy.

38.    RT Specialty acted as wholesale broker in marketing and placing the risk.

39.    RSUM exercised delegated underwriting authority in connection with the program's design, terms, and administration.

40.    Fort Myers lies within a hurricane-dominant region where major wind, rain, and storm-surge events are not hypothetical but foreseeable and recurring.

41.    The Insured Project, due to its estimated completion date, necessitated coverage for a period of two full hurricane seasons.

42.    Defendants knew, or should have known, that hurricane risk was the primary peril threatening the Insured Project.

43.    Defendants held themselves out—collectively and individually—as specialty insurance experts capable of designing and placing builders-risk insurance for complex, catastrophe-exposed construction projects.

44.    Defendants marketed their ability to deliver sophisticated risk solutions, not commodity insurance products.

45.    Plaintiffs relied on these representations in entrusting Defendants with the recommendation, structuring, underwriting, and placement of builders-risk coverage.

46.    Defendants failed to deliver fit-for-purpose builders-risk insurance for a large, ground-up, multi-family construction project located in Fort Myers, Florida, a region indisputably dominated by hurricane risk.

47.     The policy included numerous hurricane-critical provisions, including named windstorm deductibles, sub-limits, flood limitations, interior water damage limitations, protective safeguard conditions, and post-loss conditions precedent.

48.     However, Defendants failed to adequately explain or disclose how these provisions would function in a real hurricane loss for a project of the magnitude of the Insured Project.

49.     For example, RT Specialty acted as the wholesale producer and placement intermediary for the Policy and held itself out as possessing specialized expertise in construction and catastrophe-exposed risks.

50.     RT Specialty represented the Policy as appropriate builders-risk coverage for a Florida coastal project while rendering coverage that was predictably insufficient in the event of a hurricane.

51.     For example, the Policy appears to attempt to limit flood coverage—an objectively foreseeable risk in Fort Myers upon a named windstorm—to $10,000,000.00 per occurrence, despite a $34.2 million project value.

52.     The ambiguous flood coverage limitation is one example that materially undermines the risk transfer that Plaintiffs reasonably expected from a builders-risk policy for a coastal Florida project.

53.     RSUM acted as the Managing General Underwriter, exercising delegated authority to underwrite, bind, and issue the Policy on Everest paper.

54.     RSUM designed and approved a coverage structure that fractured a single hurricane occurrence into multiple coverage gaps by separating wind and flood into distinct sub-limits, severely limiting mold and interior water damage, and imposing substantial named windstorm deductibles.

55.     RSUM knew or should have known that hurricane losses in Florida routinely involve concurrent wind, flood, and water intrusion, making the Policy's structure functionally incapable of delivering meaningful coverage for its stated purpose.

56.     Therefore, RSUM, as Managing General Underwriter, approved and implemented a program structure that fragmented hurricane losses into multiple coverage gaps, including flood, interior water damage, and mold sub-limits, while maintaining the appearance of comprehensive "all risks" coverage.

57.     RSG exercised enterprise-level control over RT Specialty and RSUM, coordinated placement and underwriting strategy, and derived revenue from both brokerage and underwriting functions.

58.     Everest and Westchester insured the Policy.

59.     The Policy reflects a unified enterprise strategy designed to market specialty builders-risk coverage while minimizing catastrophic exposure through multiple structural limitations.

60.     Plaintiffs did not request inadequate coverage.

61.     Plaintiffs did not waive reliance on Defendants' specialty expertise.

62.    Defendants did not act as mere order-takers. They held themselves out as specialty insurance experts—marketing their ability to structure sophisticated builders-risk programs for complex, catastrophe-exposed projects.

63.    Plaintiffs' were owed a duty by those who held themselves out as specialists in the insurance industry.

64.    Fort Myers, Florida is located in a hurricane-dominant region subject to frequent and severe tropical storms, hurricanes, wind-driven rain, storm surge, and flooding, making hurricane risk the primary and foreseeable peril threatening the Insured Project.

65.    Plaintiffs reasonably relied on Defendants' specialized expertise to recommend, structure, underwrite, and place insurance coverage that would perform as intended in the event of a major hurricane.

66.    Defendants did not procure a simple builders-risk policy.

67.    Instead, Defendants they engineered a layered, surplus-lines, quota-share insurance program that followed the terms of an Everest builders-risk policy—an inherently complex structure requiring specialized expertise and full disclosure to ensure adequate hurricane protection.

68.    The result was a policy structure that Defendants knew or should have known would predictably defeat meaningful coverage for the insured project in the event of a hurricane loss.

**B. The Westchester Quota-Share Follow-Form Policy**

69.    In consideration for the insurance premiums paid by Plaintiffs, Westchester issued and delivered to Plaintiffs Policy No. I2365569A 001 (the "Westchester Policy").

70.    The Westchester Policy provides a 38.73% quota-share of the same builders risk coverage provided by the Everest Policy. *See* Exhibit B.

71.    The Westchester Policy was also in effect from May 12, 2021, through January 12, 2023.

72.    The Westchester Policy expressly identifies the Everest Policy as the "Followed Policy."

73.    The Westchester Policy further provides that its coverage is "subject to the same terms, conditions, warranties, limitations and definitions as the Followed Policy except for" premium, the limits of insurance, and any specific exclusions or endorsements in Westchester's policy.

74.    Under the quota-share arrangement, Everest and Westchester share losses on the Insured Project in proportion to their respective percentage shares.

75.    Plaintiffs are insured under both the Everest Policy and the Westchester Policy, and each Defendant owes contractual obligations directly to Plaintiffs.

**C. Ambiguities in Policy Limits and Sub-Limits**

76.    The Policy states a Policy Limit of Liability of $34,200,000.00 per Occurrence for all coverages combined, subject only to sub-limits "elsewhere in the Policy."

77.    In conflict with that representation, the Policy separately imposes a Property Damage Limit of Liability of $31,700,000.00 per Occurrence, without explaining how that limit interacts with the higher Policy Limit.

78.    The Policy further purports to provide Named Windstorm coverage of $34,200,000.00 per Occurrence, an amount that exceeds the stated Property Damage Limit.

79.    The Policy does not state whether Named Windstorm losses—by their nature property damage losses—are exempt from the Property Damage Limit or whether the Property Damage Limit overrides the peril-specific Named Windstorm limit.

80.    These provisions cannot be reconciled on the face of the Policy and create a reasonable expectation that property damage caused by a named windstorm is insured up to the full $34,200,000.00 Policy Limit, particularly where no priority, hierarchy, or carve-out is disclosed.

81.    The Policy provides discrete limits for Soft Costs ($1,000,000.00) and Delayed Opening ($1,500,000.00), each stated to apply "Per Occurrence and in the Term Aggregate."

82.    The Policy simultaneously states that the Policy Limit of Liability applies to all coverages combined, but does not disclose whether Soft Costs and Delayed Opening losses reduce the Property Damage Limit; reduce only the overall Policy Limit; or operate independently within the stated Policy Limit.

83.    The absence of any clarifying language regarding how time-element losses erode property damage or policy-level limits renders the Policy ambiguous as to the total amount of coverage available for a covered loss involving both physical damage and delay.

84.    A reasonable insured would interpret the Policy to permit recovery of covered property damage up to the Property Damage or Policy Limit, in addition to the separate Soft Costs and Delayed Opening limits expressly promised in the declarations.

85.    The Policy imposes Annual Aggregate limits for certain perils, including Flood and Earth Movement, while imposing Term Aggregate limits for Soft Costs and Delayed Opening.

86.    The Policy further states that no limit or sub-limit shall be reduced by loss payments except for losses subject to an Annual Aggregate or Term Aggregate, but fails to define the relationship between those two aggregate structures.

87.    The Policy does not specify whether an Annual Aggregate resets within a Term; whether a loss subject to both property damage and time-element coverage implicates multiple aggregates; or which aggregate controls in the event of overlap.

88.    These omissions create material ambiguity as to whether and when limits are exhausted, requiring construction in favor of coverage.

89.    The Policy states that General Policy Level Sub-limits apply to "all coverages and/or extensions of coverage combined."

90.    Several of those sub-limits—including Claim Preparation Costs, Rewards, and Pollution Cleanup—are not property damage coverages, yet the Policy does not state whether payments under those coverages reduce the Property Damage Limit, reduce only the Policy Limit, or operate independently.

91.    The failure to delineate how non-property damage sub-limits interact with property damage and policy-level limits renders the Policy internally inconsistent and misleading.

92.    The Policy provides a Named Windstorm limit equal to the full $34,200,000.00 Policy Limit, but does not impose an Annual or Term Aggregate on that coverage.

93.    The Policy simultaneously limits Property Damage to $31,700,000.00 per Occurrence and provides that only aggregate-limited coverages reduce limits over time.

94.    The Policy fails to explain whether a named windstorm loss is capped by the lower Property Damage Limit, is fully insured up to the Policy Limit; or exhausts coverage differently than other perils.

95.    This structural inconsistency renders the Named Windstorm limit illusory or, at minimum, ambiguous as to the actual coverage available for hurricane-related losses.

96.    The Policy was drafted exclusively by Defendants and presented to Plaintiff as providing $34,200,000.00 in builders-risk coverage for a hurricane-exposed project in Florida.

97.    Any ambiguity regarding the interaction of limits, sub-limits, and aggregates must therefore be construed against the insurer and in favor of coverage, particularly where the ambiguities affect the scope of catastrophic-loss protection.

98.    Defendants cannot rely on internally inconsistent or undisclosed limitations to defeat the reasonable coverage expectations created by the Policy's declarations and peril-specific limits.

**D. Hurricane Ian, Physical Damage, and Project Delay**

99.    In 2022, during the policy period[1], the Insured Project sustained significant physical damage as a result of Hurricane Ian, a named windstorm, including but not limited to damage to building components, water intrusion, and other physical damage to Insured Property.

100.    OTHER LOSSES

101.    The hurricane damage and related remediation work materially disrupted the planned construction schedule and delayed the completion and opening of the Insured Project.

102.    Prior to the loss, the project schedule (dated on or about September 20, 2022) showed an anticipated date of completion of approximately October 23, 2023.

103.    As a direct result of the hurricane damage and the time required to repair or replace damaged Insured Property, the actual completion date for the Insured Project was not until approximately April 2025, resulting in approximately seventeen (17) months of delay beyond the anticipated completion date.

104.    The delay caused Plaintiffs to incur substantial soft costs and delayed opening losses, including but not limited to additional construction financing interest, increased insurance premiums, project staffing and overhead, and lost rental income.

---

[1]The written insurance contracts that are referenced herein as the Everest Policy and the Westchester Policy are collectively referred to herein as "the Policy." See Exhibits A and B.

105.   The physical damage to the Insured Project and related delay in opening were caused by a peril insured against under the Everest Policy and therefore triggered coverage under the Everest Policy and the Westchester Policy.

***E. Plaintiffs' Initial Claim for Policy Sub-limits and Civil Remedy Notice Regarding Unpaid Claims***

106.   The Everest policy states in part "The Everest Property Claims team is dedicated to providing a best in class claim experience through clear communication and a customer first approach. Our team of Property and Inland Marine Claims Specialists work with you for the life of the claim and are available 24/7 to respond to all questions and concerns. Timely submission of Loss Notices complies with the terms and conditions of your policy and assists us in providing quality service to our policyholders. Any claim or circumstance which may reasonably be expected to give rise to a claim needs to be reported to Everest as soon as possible. In the event you have any questions and/or concerns regarding the claim process, contact Paul Keane[.]" See Exhibit A.

107.   "Report the Claim Immediately and Please Provide Your Policy Number: Don't delay in calling because you don't have all the information. Timely reporting is essential. *You can gather and report any missing information at a later date*." Empasis added. *Id*.

108.   Following the loss, Plaintiffs promptly provided notice to Defendants and cooperated with Defendants' adjusters, consultants, and forensic accountants,

providing extensive documentation regarding physical damage, construction schedule, soft costs, and delay.

109.  On October 1, 2022, the Insured contacted Frank Cutrone at USI via multiple emails to inform USI of the significant damage and loss.

110.  On October 1, 2022, USI informed the Insured that "the best avenue for the insured to track as cost is to create a purchase order number for anything and everything affiliated with his loss. I would also recommend an Excel spreadsheet be created to input the invoice information and track all in one isolated area" and to take "photos of damaged property and anything you will be carting off as well as anything you are removing."

111.  On October 3, 2025, USI informed insured that "[a]n Adjustor from the carrier should be assigned in the next few days."

112.  Cory Robbins, a National General Inspector at Charles Taylor scheduled an initial inspection of the Insured Project to take place on approximately October 12, 2022.

113.  The Insurers acknowledged that the Insured Project sustained a covered Loss and offered payment.

114.  However, after diligent inspection of the Loss, it was obvious that the Insured Project sustained covered damages greater than the damages acknowledged by Insurers.

115.   As of the date of the filing of this lawsuit, neither Everest nor Westchester have acknowledged that additional payments would be forthcoming, and the Insurers have failed to adequately provide coverage under the terms of the Policy.

116.   Following the catastrophic hurricane loss, Defendants engaged in conduct designed to delay, restrict, and diminish payment, consistent with broader market incentives affecting catastrophe-exposed insurers and their risk-transfer structures.

117.   Defendants delayed, restricted, and disputed coverage through technical interpretations and post-loss positions inconsistent with the coverage Plaintiffs were led to expect.

118.   Defendants' conduct reflects broader market incentives in catastrophe-exposed insurance and reinsurance structures, where loss development timing materially affects financial outcomes.

119.   On May 15, 2025, Plaintiffs sent correspondence to Insurers regarding the Named Insurer's losses and the necessity of supplementing its initial claim for physical losses, business delay, soft costs, and delayed opening loss of rental income caused directly by Hurricane Ian and covered by the policy. *See* Composite Exhibit C.

120.   On June 2, 2025, Plaintiffs filed a Civil Remedy Notice concerning the unpaid claims. *Id.*

121.  The Civil Remedy Notice was updated on November 7, 2025, to reflect Insurers continued failures under the policy. *Id.*

**F. Plaintiffs' August 5, 2025, Claim for Policy Sub-limits**

122.  On August 5, 2025, Plaintiffs submitted a written claim (the "August 5 Claim") seeking payment of three undisputed policy sub-limits that had been triggered and were fully supported:

    a.      $25,000.00 for Claim Preparation Costs;

    b.      $1,000,000.00 for Soft Costs; and

    c.      $1,500,000.00 for Delayed Opening.

123.  The August 5 Claim thus requested payment of a total of $2,525,000.00 in policy sub-limits that were clearly owed, based on documentation already in Defendants' possession and additional materials provided by Plaintiffs. *See* Exhibit D.

124.  In support of the August 5 Claim, Plaintiffs provided a report from Rockland Consulting Group ("RCG"), dated August 4, 2025 (the "RCG Report"), which identified claim preparation costs of approximately $39,055.00 and included a schedule identifying the dates of services performed and an invoice matching the claimed amount.

125.  Plaintiffs also provided a sworn proof of loss dated August 5, 2025, certifying the amounts set forth in the RCG Report, and on August 11, 2025, Plaintiffs

supplemented the August 5 Claim with a copy of the RCG invoice and additional documentation supporting the claimed sub-limits. *See* Exhibit D.

126.  Prior to Plaintiff's August 5 Claim, Defendants had notice that Plaintiffs met the soft cost and delayed income sub-limits since Defendants' own consultant, Young & Associates ("Y&A"), had previously prepared a report for Defendants' adjustment team. Exhibit E.

127.  The Y&A Report identified soft cost elements, including development staff costs, project insurance, and project loan interest, and calculated monthly soft cost exposures that, when multiplied by the period of delay, far exceeded the $1,000,000.00 soft cost sub-limit. *Id.*

128.  Among other figures, Y&A identified project loan interest payments alone of approximately $171,893.84 per month, such that the $1,000,000.00 soft cost sub-limit would be exhausted by six months of delay in that category alone, and the total period of delay was approximately seventeen months. *Id.*

129.  Based on the RCG Report, the Y&A report, and other documentation in Defendants' possession, Defendants knew or should have known that:

   a.      claim preparation costs exceeded the $25,000.00 claim preparation sub-limit;

   b.      soft cost losses exceeded the $1,000,000.00 soft cost sub-limit; and

c.      delayed opening losses exceeded the $1,500,000.00 delayed opening sub-limit.

130.  Despite Plaintiffs' full compliance with policy requirements and the clear documentation of loss, Defendants failed and refused to pay the $2,525,000.00 in sub-limits requested in the August 5 Claim.

## G. Defendants' Request-for-Information Campaign and Continued Delay

131.  Rather than promptly paying the undisputed sub-limits, Defendants engaged in a pattern of delay and obstruction that included issuing repetitive and unnecessary requests for information ("RFIs") unrelated to the already-documented sub-limit claims. *See* Composite Exhibit G.

132.  On or about October 17, 2025, a representative for the Insurers sent Plaintiffs requests for information ("RFI") that were overly-broad and not tailored to the sub-limit claims. *Id.*

133.  On October 21, 2025, Plaintiffs' counsel replied to the October 17th email and identified certain irrelevant requests and placed Insurers on notice that the Insureds' claims were not receiving the appropriate attention deserved. *Id.*

134.  On or about November 14, 2025, Insurers sent correspondence instructing Plaintiffs' counsel to review an attachment identified as "MDD RFI Rev. 1," prepared by Matson, Driscoll & Damico, LLP ("MDD"), Defendants' forensic accountants.  *Id.*

135.   The November 14th correspondence purported to "acknowledge receipt of your claim for lost revenue and soft costs," but failed to recognize that the August 5 Claim explicitly sought three distinct sub-limits, including claim preparation costs and delayed opening, not merely lost revenue and soft costs. *Id.*

136.   Additionally, the November 14th contained the same RFI from the October 17, 2025, correspondence, specifically requesting information that is irrelevant to the sub-limit claims and requested voluminous data beyond what was reasonably needed to adjust the claim. *Id.*

137.   Plaintiffs reasonably understood Defendants' repeated irrelevant RFIs, issued months after the August 5 Claim and supplemental documentation, to be a delay tactic designed to discourage Plaintiffs from pursuing monies owed under the policies and to postpone payment of undisputed amounts.

138.   On or about November 18, 2025, Plaintiffs' counsel responded, explaining that the $2,525,000.00 in sub-limits were fully supported, that the requests for unnecessary information were improper under Florida law, and that Plaintiffs would file suit if the sub-limits were not paid within ten (10) business days. *See* Exhibit H.

139.   Nonetheless, acting in good faith and in an attempt to prevent litigation, Plaintiffs fully responded to the duplicative and excessive requests for information

concerning the three outstanding unpaid sub-limits (claims preparation costs, lost revenue, and soft costs). *See* Composite Exhibit I.

140. Plaintiffs continued to engage with experts and provided Insurers with the alleged "outstanding information" on December 2, 2025, and December 3, 2025. *Id.*

141. As of the filing of this Complaint, more than 125 (one hundred and twenty-five) days have elapsed since Plaintiffs' August 5 Claim and August 11 supplement, and Defendants have still not paid the claim preparation cost sub-limit, the soft cost sub-limit, or the delayed opening sub-limit, nor have they fully indemnified Plaintiffs for the covered hurricane loss.

142. Defendants have also failed to pay undisputed portions of other covered losses and have not provided timely or adequate written explanations for their failure to pay.

### H. Notice of Intent to Sue and Damages

143. On November 18, 2025, Plaintiffs served Defendants with a Notice of Intent to Sue ("NOI"), identifying Everest and Westchester as the Insurers, describing the policies, outlining the factual background of the claim, and placing Defendants on notice of the causes of action Plaintiffs intended to assert. *See* Exhibit H.

144. In the NOI, Plaintiffs advised Defendants that the outstanding total net claims owed to Plaintiffs amounted to approximately $14,881,034.00, which included the

$2,525,000.00 in sub-limits that had been fully submitted as of August 5, 2025, and remained unpaid.

145.   Plaintiffs further advised Defendants that, based on the terms of the policies and the extent of the hurricane damage and resulting delay, Plaintiffs' total damages, including unpaid policy benefits and consequential losses for the Insured Project, were approximately $51,881,034.00.

146.   Despite receiving the NOI, Defendants did not cure their violations and continued to withhold payment of the undisputed sub-limits and other covered losses.

147.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial damages, including but not limited to unpaid policy benefits, increased financing costs, lost rental income, project overhead, expenses associated with responding to Defendants' unreasonable RFIs, attorneys' fees, and other consequential damages.

### I. Pattern and Enterprise

148.   Plaintiffs are informed and believe, and allege, that Defendants' conduct toward Plaintiffs is not an isolated instance but part of a broader, ongoing pattern of conduct involving Defendants and other participants in the placement and adjustment of builders risk coverage for large construction projects in Florida.

149.    Specifically, Plaintiffs allege that Everest and Westchester, together with RSG, RT Specialty, and RSUM as producers and brokers involved in placing the policies for the Insured Project and underwriters for same, formed and operated an association-in-fact enterprise (the "Insurance Enterprise") within the meaning of 18 U.S.C. § 1961(4) and Fla. Stat. § 895.02.

150.    The purpose of the Insurance Enterprise was, among other things, to:

    a.    sell and collect premiums for builders risk and related coverage for multi-million-dollar construction projects in hurricane-exposed regions such as Florida;

    b.    represent and market such coverage as adequate and sufficient to protect insureds from hurricane-related risks, including soft costs and delayed opening losses; and

    c.    systematically delay, underpay, or deny valid claims for hurricane-related losses, including soft cost and delayed opening claims, in order to maximize Defendants' profits and minimize claim payouts.

151.    In furtherance of this enterprise, Defendants and their co-participants used interstate wires and mails to transmit applications, binders, policies, endorsements, claims submissions, RFIs, consultant reports, and correspondence containing material misrepresentations and omissions regarding the expertise of their agency,

the adequacy of the limits for hurricane-related losses, and the status and handling of claims.

152.   Predicate acts of mail and wire fraud include, without limitation:

    a.    written and electronic statements to Plaintiffs during underwriting that misrepresented or concealed the practical inadequacy of coverage for hurricane-related soft costs and delay losses;

    b.    written and electronic statements to Plaintiffs during the claims process that mischaracterized the August 5 Claim as including only "lost revenue and soft costs," while ignoring Plaintiffs' express request for all three sub-limits, thereby misrepresenting the scope of the claim;

    c.    repeated RFIs and communications demanding unnecessary and duplicative documentation while omitting the fact that Defendants already possessed sufficient information to pay the $2,525,000.00 sub-limits and substantial additional amounts; and

    d.    other communications designed to create the false impression that payment could not be made without further information, when in fact Defendants had already determined that the claimed losses exceeded the applicable sub-limits.

153.   Plaintiffs allege that Defendants have employed similar tactics—under-adjusting, delaying, and obstructing claims submissions—on other construction

projects insured under the same or similar programs in Florida, thereby establishing a pattern of racketeering activity over a substantial period.

154.   Plaintiffs further allege that as a direct and proximate result of Defendants' participation in the Insurance Enterprise and pattern of racketeering activity, Plaintiffs have suffered injury to their business and property in an amount to be proven at trial, including but not limited to the difference between the insurance proceeds received and the actual cost of repairing hurricane damage and funding the extended construction and opening period, as well as consequential damages.

## V. CONDITIONS PRECEDENT

155.   All conditions precedent to Plaintiffs' rights to recover under the policies have occurred and/or been performed.

156.   To the extent required by Florida law, Plaintiffs have filed a Civil Remedy Notice and/or provided statutory notice pursuant to Fla. Stat. §§ 624.155 and 626.9541 and have given Defendants an opportunity to cure, which they have failed to do.

## VI. CAUSES OF ACTION[2]

---

[2] All causes of actions set forth herein, unless specifically stated by limiting the facts in the Count to the "Insurers" or to any of the individually identified Defendants, are otherwise intended as alleged against all Defendants.

**COUNT I – BREACH OF CONTRACT**

157.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

158.  The Everest Policy and the Westchester Policy constitute valid and binding contracts of insurance between Plaintiffs and Insurers, Everest and Westchester.

159.  Plaintiffs performed all obligations required under the policies, including but not limited to the payment of premiums, providing timely notice of loss, submitting proofs of loss, and cooperating with Insurers' investigation.

160.  The hurricane damage to the Insured Project, the resulting construction delays, and the associated soft cost and delayed opening losses are covered losses under the policies, subject to the stated limits and sub-limits.

161.  The Policy also provides for a sub-limit of $25,000.00 for claim preparation costs to cover "reasonable and necessary fees paid to auditors, accountants, architects and/or engineers for producing and certifying particulars or details of the Insured's business in order to determine the amount of loss payable under this Policy."

162.  Plaintiffs submitted the August 5 Claim and subsequent supplemental documentation requesting payment of the $25,000.00 claim preparation sub-limit, the $1,000,000.00 soft cost sub-limit, and the $1,500,000.00 delayed opening sub-limit, as well as additional amounts due under the policies.

163.   Plaintiffs fully responded to the duplicative and excessive requests for information concerning lost revenue and soft costs.

164.   Notwithstanding coverage and documentation, Insurers Everest and Westchester have failed to acknowledge the claims preparation costs, which were fully submitted over 120 days prior to filing this suit.

165.   Insurers have refused to pay the full amount of the policy benefits owed.

166.   Insurers have refused to pay the full amount of three policy sub-limits of $2,525,000.00 and other covered losses that have been presented to Insurers.

167.   Insurers and their agents have failed to assist Plaintiffs in claims preparations for maximum recovery under the Policy.

168.   Insurers' failure to pay Plaintiffs for the damages/losses incurred from Hurricane Ian constitutes a material breach of the Policy.

169.   Insurers' conduct in respect to claims processing and Plaintiffs related recovery efforts constitutes a material breach of the Policy.

170.   As a direct and proximate result of Insurers' breaches, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to unpaid policy benefits and consequential damages.

171.   Plaintiffs are entitled to recover such damages, plus interest, attorneys' fees where authorized, and costs.

## COUNT II – DECLARATORY JUDGMENT ON UNDISPUTED AND UNPAID SUB-LIMITS

172.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

173.  An actual, present, and justiciable controversy exists between Plaintiffs and Defendants regarding the parties' rights and obligations under the policies, including but not limited to the scope of coverage, the applicability of exclusions, and the amounts owed.

174.  RSG acted as a producer for the Policy and participated in its placement, marketing, and issuance.

175.  The Insurers, both Everest and Westchester, are bound by the Policy which RSG produced, and which Named Insured purchased.

176.  Plaintiffs contend that the Insured Project sustained damages from Hurricane Ian.

177.  Plaintiffs contend that irrespective of any other categories of loss, that the following categories are undisputedly covered under the Policy:

    a.      a sub-limit of $25,000.00 per occurrence for covered Claim Preparation Costs;

    b.      a sub-limit of $1,000,000.00 for soft costs; and

    c.      a sub-limit of $1,500,000.00 for delayed opening.

178.   Specific to only these three categories of sub-limits, Plaintiffs contend that Defendants are obligated to pay, at a minimum, 1) the claim preparation costs, 2) soft costs sub-limits, and 3) delayed opening sub-limits.

179.   Defendants deny or dispute Plaintiffs' entitlement to payment in whole or in part, and/or have failed to accept or confirm liability for the full amounts claimed.

180.   Pursuant to 28 U.S.C. § 2201 and applicable Florida law, Plaintiffs seek a limited declaration of the parties' rights and obligations, including that:

   a.      Coverage exists under the Policy for i) claim preparation; ii) soft cost, and iii) delayed opening sub-limits;

   b.      Defendants are bound by and responsible for the representations and coverage positions advanced in connection with the Policy; and

   c.      Plaintiffs are entitled to payment of costs that satisfy the contractual definitions of claim preparation, soft costs, and delayed opening,.

181.   A declaration as to these three undisputed sub-limits will resolve uncertainty and controversy between the parties and is necessary and appropriate under the circumstances.

## COUNT III – STATUTORY BAD FAITH - FAILURE TO ATTEMPT GOOD-FAITH SETTLEMENT AND FAILURE TO PROMPTLY SETTLE IN VIOLATION OF FLA. STAT. § 624.155(1)(b)(1) and (1)(b)(3))

182.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

183.   Defendants Everest and Westchester are insurers within the meaning of Fla. Stat. § 624.155 and issued insurance policies to Plaintiffs.

184.   After coverage was triggered and liability became reasonably clear, the Insurers failed to attempt in good faith to settle claims when, under all the circumstances, they could and should have done so had they acted fairly and honestly toward Plaintiffs and with due regard for Plaintiffs' interests; and failed to promptly settle the claims for undisputed sub-limits.

185.   Insurers' conduct includes, but is not limited to:

   a.      failing to timely pay the $2,525,000.00 in sub-limits despite clear documentation and their own consultants' findings;

   b.      failing to pay undisputed portions of other covered losses;

   c.      issuing repetitive and unnecessary RFIs months after full claims submissions;

   d.      mischaracterizing the scope of the August 5 Claim; and

   e.      unreasonably delaying the investigation and resolution of Plaintiffs' claims.

186.   Plaintiffs complied with the statutory pre-suit notice requirements of Fla. Stat. § 624.155 by filing a Civil Remedy Notice.

187.   Plaintiffs provided Everest and Westchester a NOI, providing Insurers an opportunity to cure.

36

188.   Insurers failed to cure within the statutory cure period.

189.   As a direct and proximate result of Insurers' statutory bad faith, Plaintiffs have suffered extra-contractual damages, including, but not limited to, delay damages, additional financing costs, lost income, and attorneys' fees, in an amount to be proven at trial.

## COUNT IV – UNFAIR CLAIM SETTLEMENT PRACTICES

190.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

191.   Defendants, in the production in the policy and in the handling of Plaintiffs' claims, have engaged in one or more unfair claim settlement practices prohibited by Fla. Stat. § 626.9541(1)(i), including but not limited to:

    a.      failing to adopt and implement standards for the proper investigation of claims;

    b.      failing to acknowledge and act promptly upon communications with respect to claims;

    c.      failing to promptly provide a reasonable explanation in writing for the basis of denial or partial payment;

    d.      failing to promptly notify Plaintiffs of any additional information necessary for processing the claims;

e.      failing to pay undisputed amounts of partial or full benefits owed under

the policies; and

f. making material misrepresentations related to coverage and claim handling.

192.  These unfair practices have occurred with such frequency as to indicate a

general business practice.

193.  Plaintiffs complied with the statutory pre-suit notice requirements of Fla. Stat.

§ 624.155 by filing a Civil Remedy Notice.

194.  Subsequent to the filing of the Civil Remedy Notice, along with the

supplemental/amended Civil Remedy Notice, Insurers continued to issue Plaintiffs

additional irrelevant requests for information and failed to acknowledge and/or act

promptly upon communications with respect to claims.

195.  Plaintiffs provided a NOI to all Defendants, providing an opportunity to cure.

196.  Defendants' unfair claim settlement practices have caused Plaintiffs to suffer

damages beyond the mere non-payment of policy benefits, including consequential

damages, attorneys' fees, and other harms proximately caused by Defendants'

misconduct.

## COUNT V – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Violations of Fla. Stat. § 501.201 et seq.)

197.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of

this Complaint as if fully set forth herein.

198.  Defendants are each engaged in "trade or commerce" within the meaning of FDUTPA by producing, marketing, selling, and administering insurance policies in Florida.

199.  Defendants' acts and practices, such as misrepresenting the expertise in insurance production, delaying and obstructing legitimate claims, and using deceptive RFIs designed to deter or postpone payment, constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

200.  While the Everest Policy was marketed and placed as providing comprehensive builders-risk protection suitable for a large, ground-up, hurricane-exposed construction project, the cumulative effect of the Policy's sub-limits, deductibles, exclusions, and conditions precedent materially impaired the Policy's ability to perform as represented in the event of a major hurricane.

201.  Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers such as Plaintiffs.

202.  As a direct and proximate result of Defendants' FDUTPA violations, Plaintiffs have suffered actual damages, including but not limited to excessive losses, unpaid benefits, additional soft costs and financing expenses caused by delay, and other economic harms.

203.   Plaintiffs are entitled to recover their actual damages, attorneys' fees, and costs under FDUTPA.

## COUNT VI - NEGLIGENT PROCUREMENT

204.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

205.   RSG and RT Specialty issued and procured builders-risk insurance suitable for the ground-up construction of a multi-family residential project in Fort Myers, Florida, with a stated Total Project Value of $34,200,000.00.

206.   In doing so, RT Specialty assumed a duty to exercise reasonable skill, care, and diligence in procuring insurance consistent with the insured's stated needs and the foreseeable risks inherent to a coastal Florida construction project.

207.   RSG and RT Specialty owed Plaintiffs a duty to procure builders-risk insurance suitable for a hurricane-exposed construction project.

208.   As one example, flood loss was an objectively foreseeable and material risk for the Project, given its geographic location and hurricane exposure.

209.   RSG and RT Specialty failed to Procure flood coverage commensurate with the Project's value; procure excess or supplemental flood coverage; and/or advise Plaintiff that the Policy materially transferred catastrophic flood risk back to the insured.

210.  Therefore, RSG and RT Specialty breached their duty by procuring a policy in which flood coverage was sub-limited to $10,000,000.00 per occurrence, an amount materially disproportionate to the Project's value and restoration costs following a major storm event

211.  As a direct and proximate result of RSG and RT Specialty's negligent procurement, Plaintiff sustained uninsured or underinsured losses.

**COUNT VII – NEGLIGENT MISREPRESENTATION**

212.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

213.  RSG and RT Specialty held themselves out as possessing specialized expertise in construction and catastrophe-exposed risks and affirmatively represented that the Policy constituted appropriate builders-risk coverage for the Project.

214.  Fort Myers, Florida lies within a hurricane-dominant coastal region where major wind, rain, storm surge, and flooding events are foreseeable and recurring.

215.  At the time the Policy was placed, Defendants knew or should have known that flood and wind-driven water intrusion represented primary catastrophic risks to the Insured Project.

216.    In connection with placement of the Policy, RSG and RT Specialty failed to disclose, or inadequately disclosed, that flood coverage was capped at $10,000,000 per occurrence, despite a Policy Limit and Total Project Value of $34,200,000.

217.    RSG and RT Specialty did not meaningfully explain that a single flood event could exhaust the available flood coverage; that flood losses routinely accompany named windstorm events in Fort Myers; and/or that the Policy's "all risks" grant was materially eroded by flood sub-limits.

218.    RSG and RT Specialty knew or should have known that these omissions created a false impression regarding the scope of flood coverage.

219.    Plaintiffs reasonably relied on Defendants' representations for insurance procurement and placement, in part because the representations concerning RSG and RT Specialty's specialty expertise in insurance policies of this nature.

220.    Plaintiffs reasonably relied on RSG and RT Specialty's representations and omissions in purchasing the Policy.

221.    Defendants, through their agents and representatives, made representations to Plaintiffs regarding the adequacy and extent of the builders risk coverage and sub-limits for hurricane-related soft costs and delayed opening losses; and the nature and scope of Plaintiffs' catastrophic losses, the associated claims, and the documentation required to process Plaintiffs' claim.

222.   Defendants supplied this information in the course of their businesses as insurers and claim handlers and knew or should have known that Plaintiffs would rely on it.

223.   The representations were false or misleading, and Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

224.   Plaintiffs justifiably relied on Defendants' misrepresentations and omissions by purchasing and maintaining coverage, by continuing to cooperate and provide documentation in response to RFIs.

225.   As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs suffered damages, including unpaid benefits, extended project costs, and other consequential damages.

## COUNT VIII – NEGLIGENT UNDERWRITING – NEGLIGENT MISREPRESENTATION

226.   Ryan Specialty Underwriting Managers ("RSUM") acted as the Managing General Underwriter, with delegated authority to design, underwrite, bind, and issue the Policy on Everest paper.

227.   RSUM negligently designed and administered a builders-risk program unfit for hurricane-dominant risk.

228.  RSUM approved and implemented a program structure that sub-limited flood coverage to $10,000,000; maintained the appearance of "all risks" builders-risk coverage; and failed to warn insureds that catastrophic flood losses would not be fully insured.

229.  RSUM knew or should have known that, for a Fort Myers construction project, flood losses could reasonably exceed the sub-limit in a single storm event.

230.  RSUM's underwriting decisions and omissions rendered the Policy materially misleading as to the scope of coverage provided.

231.  Plaintiff reasonably relied on the underwriting structure RSUM approved and suffered damages as a result.

## COUNT IX – ENTERPRISE & AGENCY LIABILITY FOR MISREPRESNTATION

232.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

233.  RSG held itself out as a specialty insurance enterprise.

234.  Plaintiffs reasonably relied on that appearance.

235.  RSG is liable for the acts of its agents and enterprise partners.

236.  RSUM knowingly assisted RT Specialty's breaches by supplying and maintaining a deficient program structure.

237.  RSG failed to supervise and control enterprise-level placement and underwriting practices.

238.  Defendants knowingly made false statements of material fact, and/or knowingly concealed material facts, regarding hurricane-related coverage limitations and the adequacy and sufficiency of coverage for the Insured Project;

239.  Defendants made these misrepresentations and omissions with the intent that Plaintiffs rely upon them, to Defendants' financial benefit and Plaintiffs' detriment.

240.  Plaintiffs did in fact rely on Defendants' false statements and omissions and were thereby induced to continue their relationship, incur additional costs, and delay or forego other protective measures.

241.  As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs have suffered damages, including but not limited to the amounts of unpaid policy benefits, additional soft costs, and consequential losses.

242.  Plaintiffs seek compensatory and, where permitted by law, punitive damages due to the intentional and egregious nature of Defendants' conduct.

## COUNT X – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c) and (d); 1964(c))

243.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

244.   Defendants Everest, Westchester, RSG, RT Specialty, and RSUM are each "persons" within the meaning of 18 U.S.C. § 1961(3).

245.   From at least January 2021 through the present, Defendants associated together and constituted an association-in-fact enterprise (the Insurance Enterprise) within the meaning of 18 U.S.C. § 1961(4).

246.   The Insurance Enterprise had a common purpose—to market, place, issue, and administer a surplus-lines builders-risk insurance program for catastrophe-exposed construction projects while concealing material coverage limitations, misrepresenting the scope of hurricane and flood protection, and systematically minimizing or avoiding claim payments following catastrophic losses.

247.   The Enterprise had relationships and structure, including: RSG and RT Specialty acting as wholesale brokers and intermediaries; RSUM acting as managing underwriter and program administrator with delegated authority over program design, terms, and administration; and Everest and Westchester issuing insurance paper through quota-share and follow-form participation and exercising control over claims payments.

248.   The Enterprise had longevity sufficient to pursue its purpose, operating continuously across multiple policy periods, placements, renewals, and claims arising from Florida hurricane losses.

249.  At all relevant times, the activities of the Enterprise affected interstate commerce within the meaning of 18 U.S.C. § 1962, including interstate transmission of emails, binders, policies, invoices, and claims communications; interstate placement of insurance risks through surplus-lines markets; interstate premium payments and claims fund transfers; and coordinated underwriting and claims administration among entities located in different states.

250.  Defendants purposefully directed their conduct toward the State of Florida by marketing, placing, underwriting, and administering insurance coverage for a Florida construction project; issuing and delivering policies covering Florida property; and adjusting and paying—or failing to pay—claims arising from a Florida catastrophic loss.

251.  Each Defendant is distinct from the Enterprise for purposes of 18 U.S.C. § 1962(c).

252.  In violation of 18 U.S.C. § 1962(c), Defendants knowingly conducted or participated, directly or indirectly, in the conduct and affairs of the Insurance Enterprise through a pattern of racketeering activity.

253.  Between approximately February 2021 and September 2022, Defendants devised and executed a scheme to defraud Plaintiffs in connection with the marketing and placement of builders-risk insurance for catastrophe-exposed Florida construction projects.

254. As part of that scheme, Defendants—acting through RSG, RT Specialty, RSUM, Everest, and Westchester—transmitted and caused to be transmitted false and misleading statements and material omissions via interstate mail and wire communications, including but not limited to:

    a.    Policy quotations, binders, underwriting submissions, and placement communications transmitted during Spring–Summer 2021, which represented that the builders-risk program provided fit-for-purpose hurricane coverage while omitting that flood coverage was materially capped and functionally insufficient for a coastal Florida project;

    b.    Policy issuance and endorsement communications transmitted in or about late 2021, which failed to disclose or affirmatively obscured the interaction between flood sub-limits, follow-form exclusions, and quota-share layering that substantially impaired coverage;

    c.    Renewal, confirmation, and premium-invoice communications transmitted during 2022, which reiterated prior misrepresentations and omissions and induced Plaintiffs to maintain coverage and continue paying premiums.

255. These acts constitute mail fraud and wire fraud chargeable under 18 U.S.C. §§ 1341 and 1343.

256. Following Hurricane Ian in September 2022, Defendants committed additional racketeering acts in furtherance of the same scheme and Enterprise.

257. Between September 2022 and at least mid-2023, Defendants—through coordinated conduct among RSUM, Everest, and Westchester—engaged in deceptive acts and practices during the adjustment and payment of Plaintiffs' insurance claims, including:

a.    Transmitting claims communications that mischaracterized policy terms, invoked undisclosed or inapplicable sub-limits, or reinterpreted coverage positions inconsistently with pre-loss representations;

b.    Delaying adjustment, fragmenting coverage determinations among quota-share participants, and asserting post-loss coverage positions designed to reduce or eliminate payments for hurricane-related losses;

c.    Failing to disclose internal underwriting intent and program-level limitations known at placement but concealed from Plaintiffs.

258. These post-loss acts were not isolated claims disputes but were integral to the Enterprise's ongoing fraudulent scheme, ensuring that the misrepresented insurance product predictably failed to perform when a catastrophic loss occurred.

259. The racketeering acts were related in purpose, victims, methods, and results and constituted both closed-ended and open-ended continuity, posing a threat of continued criminal activity.

260. The acts spanned multiple years, involved multiple transactions, and formed part of Defendants' regular way of doing business, satisfying 18 U.S.C. § 1961(5).

261. Defendants knowingly agreed and conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), by agreeing that one or more members of the Enterprise would commit acts constituting a pattern of racketeering activity.

262. Each Defendant knew the essential nature of the plan, agreed to participate in it, and committed overt acts in furtherance of the conspiracy.

263. As a direct and proximate result of Defendants' RICO violations and conspiracy, Plaintiffs suffered injury to business or property, including:

  a. Payment of premiums for illusory or materially impaired insurance coverage;

  b. Unpaid and underpaid policy benefits following Hurricane Ian;

  c. Increased construction, remediation, and financing costs;

  d. Project delays and lost use; and

  e. Other consequential financial losses.

264. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, costs, reasonable attorneys' fees, and all other relief authorized by federal RICO.

**COUNT XI - FLORIDA RACKETEERING / FLORIDA RICO (Fla. Stat. §§ 895.03(3); 772.103(3)–(4); 772.104; 895.05)**

265. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

266. Defendants Everest, Westchester, RSG, RT Specialty, and RSUM are each "persons" within the meaning of Fla. Stat. §§ 895.02(7) and 772.102(3).

267. From at least January 2021 through the present, Defendants associated together and constituted an association-in-fact enterprise (the Insurance Enterprise) within the meaning of Fla. Stat. §§ 895.02(5) and 772.102(4).

268. The Insurance Enterprise had a common purpose—to market, place, issue, and administer a surplus-lines builders-risk insurance program for Florida construction projects while concealing material coverage limitations, misrepresenting the scope of hurricane and flood protection, and systematically minimizing or avoiding claim payments following catastrophic losses.

269. The Enterprise had relationships and structure, including RSG and RT Specialty acting as wholesale brokers and intermediaries; RSUM acting as managing underwriter and program administrator; and Everest and Westchester serving as subscribing insurers issuing quota-share, follow-form policies tied to a master builders-risk program.

270. The Enterprise had longevity sufficient to pursue its purpose, operating continuously across multiple policy periods, placements, renewals, and claims arising from Florida hurricane losses.

271.  In violation of Fla. Stat. § 895.03(3), Defendants knowingly conducted or participated, directly or indirectly, in the conduct and affairs of the Insurance Enterprise through a pattern of criminal activity.

272.  Between approximately February 2021 and September 2022, Defendants devised and executed a scheme to defraud Plaintiffs in connection with the marketing and placement of builders-risk insurance for a Florida construction project located in a hurricane-prone region.

273.  As part of that scheme, Defendants—acting through RSG, RT Specialty, and RSUM—transmitted and caused to be transmitted false and misleading statements and material omissions via interstate and intrastate mail and wire communications, including but not limited to:

a.    Policy quotations, binders, underwriting submissions, and placement communications transmitted by email and electronic platforms during Spring–Summer 2021, which represented that the builders-risk program provided fit-for-purpose hurricane coverage while omitting that flood coverage was materially capped and functionally insufficient for a coastal Florida project;

b.    Policy issuance and endorsement communications transmitted by mail and wire in or about late 2021, which failed to disclose or affirmatively obscured the interaction between flood sub-limits, follow-form exclusions, and quota-share layering that substantially impaired coverage;

    c.     Renewal, confirmation, and premium-invoice communications transmitted during 2022, which reiterated prior misrepresentations and omissions and induced Plaintiffs to maintain coverage and continue paying premiums.

274. These acts constitute criminal conduct chargeable under Fla. Stat. §§ 817.034 and 815.06, as well as corresponding federal mail and wire fraud statutes incorporated into Fla. Stat. § 772.102(1).

275. Following Hurricane Ian in September 2022, Defendants committed additional racketeering acts in furtherance of the same scheme and Enterprise.

276. Between September 2022 and at least mid-2023, Defendants—through coordinated conduct among RSUM, Everest, and Westchester—engaged in deceptive acts and practices during the adjustment and payment of Plaintiffs' insurance claims, including:

    a.     Transmitting claims communications by email and letter that mischaracterized policy terms, invoked undisclosed or inapplicable sub-limits, or reinterpreted coverage positions inconsistently with pre-loss representations;

    b.     Delaying adjustment, fragmenting coverage determinations among quota-share participants, and asserting post-loss coverage positions designed to reduce or eliminate payments for hurricane-related losses;

    c.     Failing to disclose internal underwriting intent and program-level limitations that were known to Defendants at placement but concealed from Plaintiffs.

277. These post-loss acts were not isolated claims disputes but were integral to the Enterprise's ongoing fraudulent scheme, ensuring that the misrepresented insurance product predictably failed to perform when a catastrophic loss occurred.

278. The racketeering acts described above were related in purpose, victims, methods, and results, and constituted a closed-ended and open-ended pattern of criminal activity affecting trade and commerce within the State of Florida.

279. The acts spanned multiple years, involved multiple victims and transactions, and posed a continuing threat of repetition, including future placements, renewals, and claims under the same builders-risk program structure.

280. Defendants knowingly agreed and conspired to violate Fla. Stat. § 895.03, in violation of Fla. Stat. § 772.103(4), by agreeing that one or more members of the Enterprise would commit acts constituting a pattern of criminal activity.

281. Each Defendant knew the essential nature of the plan, shared in the common purpose of the Enterprise, and benefited financially from the scheme through premiums, commissions, underwriting profits, and reduced claim payments.

282. As a direct and proximate result of Defendants' racketeering conduct and conspiracy, Plaintiffs suffered injury to business or property, including:

a.      Payment of premiums for illusory or materially impaired insurance coverage;

b.      Unpaid and underpaid policy benefits following Hurricane Ian;

c.      Increased construction, remediation, and financing costs;

d.      Project delays and lost use; and

e.      Other consequential financial losses.

295. Plaintiffs have complied with, or are excused from, the pre-suit notice requirements of Fla. Stat. § 772.104(1).

296. Pursuant to Fla. Stat. §§ 772.104 and 895.05, Plaintiffs seek treble damages, attorneys' fees, costs, and all other relief authorized by Florida's RICO statutes.

## COUNT XI – UNJUST ENRICHMENT

283.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein and plead this count in the alternative to their contract claims.

284.  Plaintiffs conferred a direct benefit on Defendants by paying substantial premiums for builders risk coverage for the Insured Project.

285.  Defendants knowingly accepted and retained those premiums.

286.  It would be inequitable for Defendants to retain the benefits of the premiums without providing the coverage and claim payments for which Plaintiffs paid,

particularly where Defendants have unreasonably withheld payment of undisputed amounts.

287.   In equity and good conscience, Defendants should be required to disgorge the unjust benefits retained and/or pay Plaintiffs the amounts owed.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally where appropriate, and award

a. Compensatory damages for unpaid policy benefits, including property damage, soft costs, delayed opening losses, claim preparation costs, and other covered amounts;

b. Consequential and extra-contractual damages resulting from Defendants' bad-faith and unfair claim settlement practices;

c. Treble damages under federal and Florida RICO;

d. Disgorgement or restitution of amounts wrongfully retained by Defendants;

e. Pre-judgment and post-judgment interest;

f. Attorneys' fees and costs as permitted by law, including under Fla. Stat. §§ 624.155, 626.9541, 501.2105, 895.05, and 18 U.S.C. § 1964(c);

g. Declaratory relief as requested in Count II;

h. Such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Dated: December 16, 2025.

Respectfully submitted,

*/s/ Christopher Y. Mills*____
Christopher Y. Mills
Florida Bar No. 72207
MILLS
560 Village Blvd, Suite 260
West Palm Beach, FL  33409
Telephone: (561) 486-5902
Primary Service: cmills@mills.legal
Secondary Service: pleadings@mills.legal